**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:                                                                    BANKRUPTCY PROCEEDING

ROBERT WAYNE SIMS                                         CASE NUMBER: 26-00138 JAW

---

**NORTH POINT RX, LLC**                                                          **PLAINTIFF**

VS.                                        ADVERSARY PROCEEDING NO. _____

**ROBERT WAYNE SIMS**                                                         **DEFENDANT**

---

**COMPLAINT OBJECTING TO DISCHARGE OF
A PARTICULAR DEBT UNDER §523**

---

COMES NOW, North Point Rx, LLC, by and through its counsel, and files this Complaint Objecting to Discharge of a Particular Debt Under §523 against Robert Wayne Sims, and in support thereof, would show unto the Court the following:

**JURISDICTION**

1.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334, 28 U.S.C. §157, 11 U.S.C. §105, 11 U.S.C. §523, Rule 7001 of the Federal Rules of Bankruptcy Procedure and related code sections and rules.

**PARTIES**

2.

The Plaintiff is North Point Rx, LLC (hereinafter "North Point"). North Point is a Delaware limited liability company with its principal place of business in Cheyenne, Wyoming. The members of North Point are citizens of Florida. North Point is represented by Derek A. Henderson, Attorney at Law, 1765-A Lelia Drive, Suite 103, Jackson, Mississippi 39216.

3.

The Defendant is Robert Wayne Sims ("Debtor" or "Sims" or "Defendant"), whose address is 203 Winter Teal Court, Madison, Mississippi 39110. Sims is represented by Thomas C. Rollins, Jr., The Rollins Law Firm, PLLC, PO Box 13767, Jackson, Mississippi 39236.

4.

North Point consents to the jurisdiction of the bankruptcy court and the entry of final orders and judgments.

**STATEMENT OF FACTS**

5.

On January 21, 2026, Robert Wayne Sims filed his petition under Chapter 7 of the United States Bankruptcy Code before the United States Bankruptcy Court for the Southern District of Mississippi (Case No. 26-00138 JAW). Stephen Smith was appointed the Chapter 7 Trustee.

6.

On January 15, 2026, Key Therapeutics, LLC ("Key") filed its petition under Chapter 7 of the United States Bankruptcy Code before the United States Bankruptcy Court for the Southern District of Mississippi (Case No. 26-00106 JAW). Stephen Smith was appointed the Chapter 7 Trustee.

7.

Key is a Mississippi limited liability company. Sims owns 100% of the membership interest in Key. Sims serves as the managing member of Key. At all relevant times, Sims controlled Key and managed all operations of Key. Key had no independent board of directors, no other officers, and no employees with authority to approve financial transactions without Sims' personal direction.

8.

On or about July 7, 2022, North Point purchased 100% of the intellectual property rights and existing inventory to two pharmaceutical assets Desoxyn and Tranxene (the "Pharmaceutical Products") from a Food and Drug Administration ("FDA") licensed pharmaceutical manufacturer.

9.

On or about July 8, 2022, North Point and Key entered into a Commercialization Agreement (the "Agreement"), under which Key would commercialize, market, and promote the Pharmaceutical Products owned by North Point. Under the Agreement, Key was required to deposit all Gross Sales into a dedicated bank account at Regions Bank (the "Bank Account") and remit 80% of net profits to North Point. A copy of the Commercialization Agreement is attached as Exhibit "W."

10.

Through the Agreement, North Point granted Key a limited license to distribute and sell

the Pharmaceutical Products. Key was required to grant North Point a priority in the Bank Account via a tri-party deposit account control agreement. Funds could only be removed from the Bank Account with North Point's written approval. Key's role with respect to the Bank Account was limited to depositing Gross Sales proceeds and paying only those Commercialization Expenses approved by North Point.

11.

At no time did North Point transfer any ownership interest in the Pharmaceutical Products or inventory to Key. The Agreement granted Key only a license to commercialize the Products within the Territory; North Point retained all beneficial ownership of the Marketing Authorizations throughout the Term (Section 3.1.1) and all physical inventory of the Pharmaceutical Products. Key held the Marketing Authorizations in its name solely for ease of administration. Under Schedule A, North Point held an interest in the Bank Account and all cash deposited therein. Key was entitled to retain its twenty percent (20%) Profit Share only after approved Commercialization Expenses were deducted and the profit distribution was calculated monthly in accordance with Schedule A. Until that calculation occurred, North Point's interest attached to the full balance of Gross Sales proceeds in the Bank Account.

12.

Beginning in approximately November 2022, Sims caused Key to move sales proceeds from the controlled Bank Account (Regions Bank Account No. ending 1717) into a separate Key-controlled Regions Bank account (Account No. ending 6565) that was hidden from North Point. This diversion began within approximately four months of the Agreement's execution and before Key terminated the Agreement.

13.

On January 19, 2023, North Point requested that Key provide the monthly accounting breakdown and profit distribution required under Schedule A, along with a Form 1099 for the profit share earned in 2022. At the time, North Point's principal was communicating through a Key Therapeutics email address (tyler@keyrx.com). Sims refused to provide accounting, falsely claiming that expenses incurred by Key had "nothing to do with Northpoint" and that North Point's contractual rights were limited to "visibility" of the Bank Account. Sims admitted in writing that no profit had been paid to North Point for 2022. That same afternoon, Sims issued a unilateral termination notice demanding that North Point accept drastically different "non-negotiable" terms - including increasing Key's share from twenty percent (20%) of Net Profits to fifty percent (50%) of gross collections, eliminating North Point's expense approval rights, and granting Key "full and complete control" of all operations - or Sims would "terminate the agreement by noon tomorrow." Sims further stated that "ALL actions on behalf of Key Therapeutics will cease until a resolution is executed," threatening to immediately halt all

commercialization activities in violation of the Agreement's wind-down requirements. North Point did not agree to these terms. The Agreement required one hundred eighty (180) days' written notification of dissolution to allow sufficient time to unwind all transactional affairs (Section 10.2.3); Sims gave less than twenty-four hours. Sims' conduct from November 2022 through January 2023 - diverting funds within four months of execution, making zero profit distributions, refusing to provide accounting, and threatening to cease all operations unless North Point accepted terms that more than doubled Key's share - demonstrates that Sims treated the Agreement's financial obligations to North Point as optional from the outset. The full January 19, 2023 email chain is attached as Exhibit "CC."

14.

After Key terminated the Agreement, Sims caused intentional damages to North Point by refusing to transfer the pharmaceutical inventory owned by North Point to North Point's new commercialization partner. The inventory that Sims refused to transfer was funded by and owned by North Point. As a direct result of Sims' refusal, North Point suffered an inventory loss of $1,735,804.44 (843 units at $2,059.08/unit). Sims' September 28, 2023 email to McCrory (Exhibit "E") confirms that Sims intended to continue relabeling and selling North Point's products under Key's label rather than return them to North Point's new commercialization partner.

15.

As a result of Sims' and Key's noncompliance with contractual provisions governing the wind down of the parties' business relationship, North Point initiated an arbitration against Key.

16.

Specifically, North Point initiated the arbitration because, among other reasons, Key terminated the Agreement and then refused to execute the paperwork and take the steps required to transfer North Point's FDA-approved pharmaceutical assets - including the drug applications, related regulatory rights, and remaining inventory - to North Point's new commercialization partner. In substance, Key was holding North Point's Pharmaceutical Products hostage.

17.

In addition, Key had removed all revenue generated from the sale of the Pharmaceutical Products from the Regions Bank Account ending 1717 that the parties jointly established per the terms of the Agreement. All transactions related to income and the payment of expenses associated with the Pharmaceutical Products were to be done out of this Bank Account, and Schedule A to the Commercialization Agreement set forth the profit sharing formula and the rights and obligations the parties held and owed to one another. That revenue was supposed to be used to pay legitimate costs and then distributed between the parties per the terms of the

Agreement. Instead, Key removed all of the revenue and deposited that revenue in a different Regions Bank account owned solely by Key that was not disclosed to North Point. North Point knew that revenue had been removed from the Regions Bank Account ending 1717 but did not know the identity of the account into which the funds had been moved or how the funds were being used. Funds could only be removed from the Regions Bank Account ending 1717 with North Point's approval. North Point never approved the removal of the funds from the Bank Account.

18.

On September 7, 2023, Key's counsel, Joshua McCrory, filed Key's opposition to North Point's emergency arbitration application on Sims' behalf and direction, stating: "Key Needs approximately ninety (90) days to fulfill pending orders; furthermore, Key needs an additional ninety (90) days beyond that to finalize the accounting with regard to Desoxyn and make the appropriate financial distribution to North Point as it has not misspent any Desoxyn funds. Otherwise, Key will face serious and irreparable financial harm." This representation was false. By September 7, 2023, Sims had already caused Key to divert Gross Sales from the controlled Bank Account to the hidden Regions Bank account ending in 6565 for approximately ten months and was using North Point's proceeds for Key's operating expenses, personal enrichment, and unauthorized transactions.

19.

On September 14, 2023, an Emergency Arbitrator Order was entered for sequestration of funds. Key was ordered to immediately deposit $500,000.00 and all Gross Sales into the controlled Bank Account.

20.

Prior to North Point filing for Arbitration, North Point had full visibility into the Bank Account so that it could monitor deposits of revenue and withdrawals to pay approved expenses. However, during the Arbitration, on September 23, 2023, Key removed North Point's online visibility and access to the Bank Account. As of this date, Key has not restored North Point's access to the Bank Account nor has Key complied with the order of the Arbitrator to return the revenue generated from the sale of the Pharmaceutical Products back to the Bank Account.

21.

On September 28, 2023 - fourteen days after the Emergency Arbitrator entered the sequestration order requiring Key to deposit $500,000 and all Gross Sales into the controlled Bank Account - Sims sent an email to Key's attorney, Joshua McCrory, with the subject line "DESOXYN inventory on-hand." Desoxyn was one of North Point's Pharmaceutical Products. In the email, Sims discussed North Point's inventory still in Key's possession and proposed what he described as "the lesser of the two evils": continue relabeling and selling North Point's

products under Key's label and "use the showing of 'soft' proceeds to get the investment bank deal, perform a 'mini-IPO', and buy our own assets moving forward." The "soft proceeds" referenced in the email were the Gross Sales proceeds from North Point's Pharmaceutical Products - the same funds subject to the sequestration order. This email is a contemporaneous written record of Sims' plan to use North Point's restricted proceeds to create a false showing of financial strength, obtain bank financing, and acquire pharmaceutical assets for himself. That plan was subsequently executed: Sims used North Point's proceeds to create false financial statements, presented those statements to Citizens Bank to obtain a $2.5 million loan, and used the loan to purchase the Legacy-Xspire pharmaceutical assets - with McCrory, the recipient of this email, serving as Settlement Agent on the closing. A copy of this email is attached as Exhibit "E."

22.

On October 2, 2023, the Arbitrator entered a Final Order. See Exhibit "A," Final Order. However, after the Arbitrator entered the Final Order, North Point asked the Arbitrator to modify the Final Order because of additional harmful conduct by Key that caused additional damages to North Point as well as exacerbated the ongoing harm to North Point resulting from Key's failure to comply.

23.

After the Arbitrator issued his Final Order, North Point provided evidence to the Arbitrator that Key improperly blocked North Point's access to the Bank Account along with evidence that Key had drained the Bank Account of almost all of the revenue generated from the sale of the Pharmaceutical Products owned by North Point.

24.

The Arbitrator agreed, and following the submission of evidence and briefing, the Arbitrator entered the Modified Final Order because of Key's failure to comply with the initial Final Order. See Exhibit "B."

25.

On October 18, 2023, a Modified Final Order was entered in the arbitration proceeding compelling Key to, among other things:

a) deposit in the Bank Account the sum of $500,000 within five business days following the date of notification of this Modified Final Order;

b) comply with the requirements in Section 3 of Schedule A to the Agreement that all "Gross Sales" as defined in the Agreement are deposited in the Bank Account;

c) not make any disbursements from, or otherwise encumber, the Bank Account, except

(i) to pay "Commercialization Expenses" as defined in Section 3, or (ii) as otherwise approved in writing by North Point, which approval shall not be unreasonably withheld; and,

d) restore North Point's access to view transactions occurring with the Bank Account and restore North Point's visibility to the Bank Account.

26.

Based on the sales associated with the Pharmaceutical Products, prior access to the Bank Account, and other documents provided by Key, there was $2,339,602.88 in Gross Sales of the Pharmaceutical Products. Based on this information and the order from the Arbitrator, Key was required to deposit $2,339,602.88 into the Bank Account.

27.

On October 20, 2023 - two days after the Arbitrator entered the Modified Final Order on October 18, 2023 ordering Key to deposit $500,000 and all Gross Sales into the Bank Account - Sims purchased a condominium located at 1120 E. Kennedy Blvd., Unit 919, Tampa, Florida (Unit No. 04-09W, Building W, Grand Central at Kennedy Residences) for $315,000. The deed was recorded in Hillsborough County on October 24, 2023. Upon information and belief, Sims used North Point's misappropriated proceeds to purchase this property, converting restricted funds into real estate to place them beyond North Point's reach. A copy of the General Warranty Deed dated October 20, 2023 is attached as Exhibit "DD."

28.

On December 19, 2023, Key made a single payment of $26,729.09 to North Point. This represented approximately 1.14% of the $2,339,602.88 in Gross Sales from North Point's Pharmaceutical Products. This was the only payment Key ever made to North Point under the Agreement. The payment demonstrates Sims' knowledge of the obligation to remit sales proceeds to North Point while simultaneously evidencing his intent to retain the remaining 98.86%.

29.

On or about January 1, 2024, Sims on behalf of Key executed an Asset Purchase Agreement to acquire pharmaceutical assets from Legacy-Xspire Holdings, LLC (WraSer, LLC and Xspire Pharma, LLC) out of the United States Bankruptcy Court for the Middle District of Florida (Case No. 23-bk-04251-RCT) for $4,000,000. In late December 2023, Key deposited approximately $250,000 of North Point's misappropriated sales proceeds as a deposit toward the purchase price.

30.

Neither Sims nor McCrory disclosed to the Florida Bankruptcy Court, the bankruptcy trustee, or any creditor in that proceeding that the funds being used to consummate the Legacy-Xspire purchase were North Point's misappropriated proceeds over which Key had no equitable title, and were subject to the Arbitrator's sequestration order requiring their return to the controlled Bank Account.

31.

As part of the Legacy-Xspire acquisition, Key also acquired Gentex Pharma, LLC for $50,000. Sims had a prior personal relationship with the owners of Legacy-Xspire. Copay Consultants, LLC - a company co-owned by Sims - handled the copay program for Legacy-Xspire's products.

32.

On January 23, 2024, Sims met with Citizens Bank of Philadelphia to discuss a $2,500,000 loan for the express purpose of financing the Legacy-Xspire asset purchase, with Sims as 100% personal guarantor. The Citizens Bank loan overview, dated January 23, 2024, stated the loan purpose as "a loan in the amount of $2,500,000 (plus fees) for the asset purchase between WraSer, LLC, Xspire Pharma, LLC and Legacy-Xspire Holdings, LLC to be purchased by Key Therapeutics, LLC." At the time of this meeting, Sims knew that Key was required under the Modified Final Order to deposit all Gross Sales from the sale of North Point's Pharmaceutical Products into the Bank Account—an obligation that, based on documented sales, amounted to $2,339,602.88. Sims did not disclose the North Point obligation to Citizens Bank. A copy of the Citizens Bank loan overview is attached as Exhibit "G."

33.

On or about March 15, 2024, Sims on behalf of Key obtained a $2,500,000 line of credit from Citizens Bank of Philadelphia (Loan No. 33113125). Sims personally signed the loan documents and signed an unlimited personal guarantee on the loan. The assets acquired through the Legacy-Xspire transaction - funded with North Point's restricted proceeds - were then pledged as collateral to Citizens Bank through a UCC-1 financing statement filed in Mississippi on March 15, 2024.

34.

In the loan documents, Sims on behalf of Key represented that: "No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims or other events, if any, that have been disclosed to and acknowledged by Lender in

writing." North Point subpoenaed Key Therapeutics' complete loan file from Citizens Bank, and no such written acknowledgment from Citizens Bank existed. This was a false representation by Sims, as the active ICC arbitration, Emergency Arbitrator sequestration orders, and Modified Final Order were already in place at the time the loan documents were executed. Sims on behalf of Key also represented that Key had "good and marketable title to the Collateral" - but the collateral included assets derived from North Point's misappropriated funds. A copy of the Citizens Bank Business Loan Agreement is attached as Exhibit "H."

35.

In connection with the loan application, Sims provided Citizens Bank with financial statements for Key Therapeutics, including a 2023 year-end balance sheet and income statement, as well as a personal financial statement for Robert Sims dated January 19, 2024. Key's financial statements showed total assets of approximately $1.8 million - consisting primarily of $1.1 million in cash, $471,000 in accounts receivable, and $232,000 in inventory - total liabilities of only $135,000, and a reported net worth of $1.7 million. Key's income statement reported revenues of $2.4 million and net income of $1.4 million. These financial statements were materially false: the $1.1 million in cash consisted of North Point's misappropriated sales proceeds; the inventory included pharmaceutical inventory funded by and belonging to North Point; total liabilities of $135,000 omitted the arbitration award and sequestration orders requiring Key to deposit $2,339,602.88 in Gross Sales and $500,000 in cash; and the $1.4 million net income figure was inflated by a fabricated cost structure. The company-prepared compilation Sims provided to Citizens Bank reported Cost of Goods Sold of only $512 on $2.4 million in sales - an implicit admission that Key had virtually no cost basis in the products it was selling, consistent with the fact that the pharmaceutical inventory was funded by and owned by North Point. In March 2025, when Sims submitted Key's actual 2023 tax return to Citizens Bank in connection with the loan renewal, the same fiscal year showed materially different figures: Cost of Goods Sold of $1,676,547, including a $1,136,899 write-off of North Point's expired pharmaceutical inventory that Sims claimed as Key's loss. Sims thus provided Citizens Bank with two irreconcilable versions of Key's 2023 financial performance—one at origination that concealed the true cost structure to inflate net income, and one at renewal that included over $1.6 million in additional costs for the same fiscal year. Sims' personal financial statement showed total assets of $2.4 million, total liabilities of $263,000, and personal liquidity of $1.2 million described as consisting entirely of cash—but that cash was derived in substantial part from North Point's misappropriated proceeds, and the statement listed zero contingent liabilities despite the outstanding arbitration obligations. None of these documents disclosed the North Point obligation, the arbitration, or the sequestration orders. Copies of Key's 2023 financial compilation, Sims' personal financial statement dated January 19, 2024, and Sims' 2023 Schedule C/tax return are attached as Exhibits "I," "J," and "K," respectively.

36.

On March 20, 2024, Sims personally signed the closing statement for the $4,000,000 Legacy-Xspire acquisition as President of Key Therapeutics, LLC. Joshua McCrory of the McCrory Law Firm, P.C. signed as Settlement Agent. The $2,500,000 Citizens Bank loan proceeds were disbursed at closing via wire transfer directly to the Legacy-Xspire creditors. The remaining $1,300,000 balance was to be paid outside of closing pursuant to a Secured Promissory Note. McCrory served not merely as Key's attorney and settlement agent for the Legacy-Xspire closing but simultaneously as Key's counsel in the arbitration with North Point. McCrory was therefore fully aware of the Arbitrator's sequestration order - and had received Sims' September 28, 2023 email (Exhibit "E") expressly describing the plan to use North Point's restricted proceeds to obtain financing and acquire assets. A copy of the Citizens Bank closing statement, signed by Sims and McCrory, is attached as Exhibit "O."

37.

Throughout the period described above, Sims was simultaneously defying the Arbitrator's orders and systematically stripping Key of its assets and revenue. On September 16, 2024, North Point filed its Petition to Confirm Arbitration Award in the United States District Court for the Southern District of Mississippi, Northern Division (Civil Action No. 3:25-cv-00020-KHJ-MTP). A copy of the Petition to Confirm Arbitration Award is attached as Exhibit "Y."

38.

Throughout the period of noncompliance with the arbitration orders and federal court judgment, Sims used North Point's misappropriated proceeds for personal enrichment, payments to entities he owned and controlled, and to fund Key's defense against North Point's legal claims, including:

a) $15,000 per month in salary ("SIMS SALARY"), sometimes prepaid months in advance;

b) $185,000 labeled "Owner Distribution" on November 15, 2024 - two months after North Point filed its Petition to Confirm the Arbitration Award;

c) Monthly personal insurance premiums (approximately $793/month to Freedom Life Insurance) paid from Key's account;

d) Personal residential utility bills paid through Key's account;

e) On Key's bank records, hundreds of thousands of dollars in payments were sent to Gentex Pharma, LLC and Copay Consultants, LLC - entities that Sims owned and controlled; and

f) Hundreds of thousands of dollars in legal fees paid to attorneys to defend Key Therapeutics against North Point's arbitration and federal court claims - claims that Key ultimately lost, resulting in a federal court judgment against Key. Sims used North Point's own misappropriated money to fund Key's unsuccessful defense against North Point; and

g) Upon information and belief, additional payments to Sims personally, to family members, and to other entities owned or controlled by Sims, the full scope of which is the subject of ongoing discovery including subpoenas to Key's accountant and third-party financial institutions.

39.

Sims authorized each of these payments at a time when he knew that Key needed to return over $2.8 million under the arbitration award and sequestration order to the joint bank account with North Point.

40.

On November 26, 2024 - approximately two months after North Point filed its Petition to Confirm the Arbitration Award - Sims transferred management and ownership of Gentex Pharma, LLC to his brother, Peter "Bo" Trebotich III. After the transfer, Key's contact information (232 Market Street, Building K, Flowood, MS 39232) and Key's business email (info@keytherapeutics.net) remained on Gentex's Mississippi Secretary of State filings. Key's bank records show regular payments labeled "GENTEX ROYALTY PAYMENT" totaling tens of thousands of dollars per month - ranging from approximately $15,000 to over $86,000 monthly - flowing from Key's Citizens Bank account to Gentex. In April 2025 alone, Key transferred over $86,000 to Gentex in three separate "royalty payments." The retention of Key's contact information on Gentex's state filings, combined with the ongoing flow of funds from Key to Gentex, indicates that Sims maintained actual control over Gentex despite the paper transfer to his brother. Copies of Gentex Pharma's Mississippi Secretary of State filings are attached as Exhibit "R."

41.

On May 19, 2025, the United States District Court (Judge Kristi Johnson) confirmed the arbitration award and ordered Key to comply by (i) depositing $500,000 immediately, (ii) depositing all $2.34 million in Gross Sales, (iii) stopping all disbursements, and (iv) restoring North Point's account access. A copy of the Final Judgment is attached as Exhibit "C."

42.

On May 22, 2025 - three days after the federal court order - Gentex Pharma, LLC registered a new National Drug Code for Methocarbamol 500mg under ANDA040489 with a

Start Marketing Date of May 22, 2025. Key Therapeutics had previously licensed this same product directly from Oxford Pharmaceuticals, the ANDA holder, and sold it under Key's label. Key continued paying Oxford Pharmaceuticals for the manufacturing costs of Methocarbamol after Gentex's registration. Key simultaneously paid Gentex "GENTEX ROYALTY PAYMENT" amounts as reflected in Key's bank records. Upon information and belief, the Gentex registration and the associated "royalty" payments created an artificial intermediary arrangement through which Key paid Gentex - an entity Sims had transferred to his brother - for a product that Key had already licensed directly from Oxford, effectively diverting Key's revenue to an entity beyond the reach of North Point's claims while Key continued to bear the actual manufacturing costs. The FDA's National Drug Code database search results confirming the Gentex registration are attached as Exhibit "BB."

43.

In connection with Key's application to renew the $2.5 million Citizens Bank line of credit, Sims submitted false financial documents to Citizens Bank, including Sims' personal financial statement dated March 17, 2025, Sims' 2023 personal tax return (which included Key's Schedule C), and Key's 2024 year-end company-prepared financial statements. The renewal submissions revealed material discrepancies with the origination figures for the same fiscal year: the 2023 compilation provided at origination reported Cost of Goods Sold of $512 and net income of approximately $1.4 million, while the 2023 tax return provided at renewal reported Cost of Goods Sold of $1,676,547 and net income of only $84,080. Key's 2024 financial statements showed total assets inflated to $5.4 million - including $3.2 million in Legacy-Xspire assets acquired with North Point's misappropriated proceeds - and total liabilities of $4.2 million, but still listed zero contingent liabilities and made no reference to North Point, the arbitration, or the sequestration orders. Sims' personal financial statement showed total assets of $2,894,279, total liabilities of $290,908, and net worth of $2,603,371 - again with zero contingent liabilities, the same false representation Sims had made at origination. Because Key is a pass-through entity wholly owned by Sims, the false financial information in Key's books flowed directly into Sims' personal tax returns, which Sims also provided to Citizens Bank. Sims again failed to disclose any litigation, claim, or proceeding against Key - including the arbitration award, the sequestration orders, and the federal court action North Point filed in September 2024—despite the loan documents requiring such disclosure. The federal court would confirm the arbitration award and enter judgment against Key less than two months later, on May 19, 2025. Copies of Sims' March 2025 personal financial statement and Key's 2024 renewal financials are attached as Exhibit "U." A copy of Key's internal balance sheet dated December 12, 2024 is attached as Exhibit "V."

44.

Sims claimed North Point's expired pharmaceutical inventory as a tax deduction on the

2023 Schedule C for Key Therapeutics filed with Sims' personal tax return, writing off $1,136,899 in inventory that was funded by and owned by North Point. Key was ineligible to claim this deduction because Key never funded or owned the inventory. This was an independent act of conversion - Sims took North Point's inventory loss and converted it into a tax benefit for himself, avoiding hundreds of thousands of dollars in potential tax liability. See Exhibit "K."

45.

On or about June 6, 2025, Sims on behalf of Key signed a Business Loan Agreement with Citizens Bank to extend the $2,500,000 line of credit. The extension agreement contained the same representations and warranties as the origination and renewal documents, including that: "No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims or other events, if any, that have been disclosed to and acknowledged by Lender in writing." This representation was false. At the time Sims signed the June 6, 2025 extension, the United States District Court had entered a Final Judgment against Key just eighteen days earlier on May 19, 2025, confirming the arbitration award and ordering Key to deposit $500,000 and all $2,339,602.88 in Gross Sales. The Petition to Confirm the Arbitration Award had been pending on the federal court docket since September 16, 2024. Sims thus represented to a federally insured financial institution that no litigation was pending against Key at a time when a federal court judgment had already been entered against it. This was the second time Sims made the same false "no litigation" representation to Citizens Bank - first at origination in March 2024, and again at extension in June 2025 - with substantially more litigation on the record than the first. Citizens Bank's general ledger entries for the loan renewal are dated June 6, 2025, and the associated fees cleared Key's checking account on July 8, 2025, totaling $91,384.59 - including a loan settlement credit of $46,519.84, a loan origination fee of $5,000.00, a loan documentation fee of $450.00, recording fees of $74.00, and $39,340.75 in attorney fees. A copy of the Citizens Bank loan renewal fee breakdown is attached as Exhibit "EE." A copy of the June 6, 2025 Business Loan Agreement is attached as Exhibit "P."

46.

On July 3, 2025, Sims personally signed two Certifications of Financial Statement in connection with the Citizens Bank loan. The first certified the financial statements Sims had submitted dated March 17, 2025; the second certified financial statements dated July 3, 2025. In both certifications, Sims certified that the attached financial statements were "correct and complete, and accurately reflect[ed] the condition and affairs of the undersigned" and that they "reflect[ed] all known liabilities, direct or contingent." Both certifications also represented that there had been "no material adverse change in the condition or affairs of the undersigned from the date of said statements." Sims could not have truthfully signed either certification. At the

time he signed on July 3, 2025, Key was subject to the Arbitrator's sequestration orders and a federal court judgment entered on May 19, 2025 - yet the financial statements he certified as "correct and complete" did not reflect any of these obligations, and there had plainly been material adverse changes in Key's condition and affairs that Sims represented had not occurred. Copies of Sims' signed Certifications of Financial Statement are attached as Exhibit "X."

47.

On July 3, 2025, because Key refused to comply with the Federal Court's May 19, 2025 judgment and failed to deposit the ordered funds or restore North Point's Bank Account access, North Point filed a Motion for Contempt, Sanctions and Receivership in the United States District Court. A copy of the Motion for Contempt, Sanctions and Receivership with Memorandum in Support is attached as Exhibit "Z."

48.

On July 18, 2025 - fifteen days after North Point filed its Motion for Contempt, Sanctions and Receivership seeking the appointment of a receiver over Key's assets - Citizens Bank loan officer Billy Cook signed a Risk Rate Change form at 10:19 a.m. downgrading Key's risk rating from 3 to 5, noting that "Borrower is liquidating assets and ceasing operation of business." That same afternoon, at 2:14 p.m., Citizens Bank loan assistant Paula Brown froze Key's line of credit. Upon information and belief, Citizens Bank could only have known that Key was liquidating assets and ceasing operations because Sims himself notified the bank—doing so within fifteen days of North Point's motion for appointment of a receiver, who would have had authority to freeze Key's accounts and recover funds for North Point's benefit. The Citizens Bank representations and financial statements described in paragraphs 32 through 36 and 43 through 47 are alleged as evidence of Sims' knowledge, intent to deceive, pattern of concealment, and personal benefit from the misappropriation of North Point's proceeds. A copy of the Citizens Bank LOC freeze notification and risk rate change form dated July 18, 2025 is attached as Exhibit "L."

49.

On July 18, 2025, Sims on behalf of Key told the United States District Court that compliance with the May 19, 2025 order was "factually impossible" because all assets were encumbered and Key was insolvent. On that same day, Citizens Bank froze Key's line of credit and downgraded Key's risk rating to 5 - confirming that Citizens Bank itself had concluded Key was ceasing operations, even as Sims had represented to the bank just weeks earlier that no litigation was pending. Yet in April 2025 - less than three months earlier - Sims on behalf of Key had submitted financial statements to Citizens Bank showing $960,000 in cash in a demand-deposit account and $8.1 million in inventory. Either the April 2025 financials submitted to Citizens Bank were false, or the July 2025 insolvency claim to the Court was false. In either

case, Sims made material misrepresentations. Key's own Citizens Bank records for July 2025 confirm that Key was not insolvent: the checking account began the month with a balance of $933,923.77 and received $185,676.48 in deposits, and Sims processed $1,013,432.87 in withdrawals - ending the month at $106,167.38. The largest of those withdrawals occurred on July 21, 2025, when Sims directed a $550,000 "Over the Counter Debit" marked "Per Customer Request" through Citizens Bank loan officer Billy Cook - the same officer who had signed the order freezing Key's line of credit just three days earlier - and applied it to pay down the $2.5 million Citizens Bank line of credit. Sims had signed an unlimited personal guarantee on the Citizens Bank loan. By using $550,000 of North Point's misappropriated funds to pay down the loan, Sims was directly reducing his own personal guarantee exposure - effectively converting North Point's money into personal debt relief for himself. This payment was made eighteen days after North Point filed its Motion for Contempt, Sanctions and Receivership seeking the appointment of a receiver over Key's assets. A receiver would have had the authority to freeze Key's accounts and recover funds for North Point's benefit. Sims moved the money before a receiver could be appointed. During the same month Sims told the federal court that compliance was "factually impossible," he also caused Key to pay himself three months of prepaid salary ($45,000), pay over $43,000 to Copay Consultants, an entity co-owned by Sims, and pay $29,863.50 to Gentex Pharma, an entity Sims had transferred to his brother. Sims drained $1,013,432.87 from Key's account in a single month while simultaneously representing to the Court that Key had no ability to pay North Point. A copy of the $550,000 transaction slip dated July 21, 2025 is attached as Exhibit "M." A copy of Key's Citizens Bank statement for July 2025 is attached as Exhibit "N."

50.

On July 28, 2025, Key's defense counsel transmitted Key's financial statements to North Point's counsel during the federal court contempt proceedings and acknowledged in writing that "North Point's liability is not included" on Key's financials. This admission - made ten days after Key claimed insolvency and seven days after Key used $550,000 to pay down Sims' personally guaranteed bank loan instead of paying North Point - confirms that the omission of the $2.8 million North Point obligation from Key's financial statements was not an oversight but a deliberate and known concealment. A copy of Key's defense counsel's July 28, 2025 letter is attached as Exhibit "Q."

51.

On or about November 10, 2025 - nearly six months after the federal court confirmed the arbitration award and four months after North Point filed its Motion for Contempt - Sims transferred Key's drug rights to Nalfon and Fenoprofen (including the Nalfon NDA N017604 and the Fenoprofen ANDA A072267) to Pharmaco, LLC, an Arizona limited liability company formed on July 11, 2025 - just eight days after North Point filed its Motion for Contempt,

Sanctions and Receivership and seven days before Sims notified Citizens Bank that Key was liquidating assets and ceasing operations. Pharmaco's members are True Marker Pharmaceuticals, Inc. and IndentiRx, LLC, entities associated with Sims' associate Davin Deb. Key claimed the value of the transferred drug rights was approximately $500,000. Upon information and belief, Pharmaco paid approximately $500,000 for the drug rights, and the proceeds were used to further pay down Key's Citizens Bank line of credit - the same personally guaranteed loan that Sims had already paid down by $550,000 in July 2025 with North Point's misappropriated funds. If confirmed, this would represent a second conversion of North Point's assets into reduction of Sims' personal guarantee exposure. North Point has subpoenaed Pharmaco, LLC to determine whether the source of the funds used to acquire the Nalfon and Fenoprofen drug rights is connected to Sims, Key Therapeutics, or any of Sims' family members or affiliated entities. A copy of Pharmaco, LLC's Arizona Corporation Commission filing is attached as Exhibit "AA."

52.

On or about October 15, 2025, Sims also transferred a 2018 Porsche Macan to his brother Peter Trebotich. On his original bankruptcy schedules filed January 30, 2026, Sims reported the transfer price as $6,000. On his amended schedules filed April 3, 2026, Sims changed the reported consideration to $11,337.50, described as "paid towards attorney fees in civil case." According to Kelley Blue Book, the fair market value of a 2018 Porsche Macan ranges from approximately $18,500 to $28,500 depending on trim level and condition. Under either figure Sims reported on his sworn schedules, Sims transferred the vehicle to his brother at a fraction of its fair market value. The inconsistency between Sims' two sworn filings regarding the same transfer - different amounts and different characterizations of the consideration - further demonstrates Sims' pattern of providing false and inconsistent information in sworn filings.

53.

On December 31, 2025, Sims executed a General Warranty Deed transferring the Tampa condominium to Gentex Pharma, LLC - an entity he had previously transferred to his brother. The deed was prepared by Anthony & Partners, PLLC, one of Key's law firms. The deed was recorded in Hillsborough County on January 21, 2026. Hillsborough County property records list the mailing address for Gentex Pharma, LLC as 232 Market Street, Building K, Flowood, Mississippi 39232 - Key Therapeutics' business address - further confirming that Sims maintained actual control of Gentex despite the paper transfer to his brother. On his personal bankruptcy schedules (Official Form 107), Sims listed the Tampa condominium with a market value of $260,000. Sims therefore transferred a property he valued at $260,000 on his own sworn bankruptcy schedules—a property originally purchased, upon information and belief, with North Point's misappropriated proceeds for $315,000 - to an entity controlled by his brother. A copy of the deed is attached as Exhibit "F."

54.

On December 17, 2025, a status conference was held before United States District Judge Kristi Johnson with counsel for North Point and Key Therapeutics. The Court ordered that it would rule on North Point's Motion for Contempt, Sanctions and Receivership following receipt of the parties' forensic examiners' reports and after an evidentiary hearing. Rather than submit to a forensic examination of Key's financial records and face contempt sanctions and a potential receiver, Sims caused Key to file its Chapter 7 petition on January 15, 2026, and Sims filed his personal Chapter 7 petition on January 21, 2026.

55.

Copay Consultants, LLC was co-owned by Sims and Ronnie Grogan. Key's bank records show regular payments to Copay Consultants, including invoices labeled "COPAY INV" and "PREFUND REPLENISHMENT," often $5,000 to $38,000 or more per payment, multiple times per month. Key made these payments to Copay Consultants on an ongoing basis through the period of the ownership transfer. On January 13, 2026 - two days before Key's bankruptcy filing - Sims transferred his ownership interest in Copay Consultants to Ronnie Grogan by filing Articles of Amendment with the Mississippi Secretary of State, removing Sims as registered agent and manager and installing Grogan as the sole member. Prior to this filing, both Sims and Grogan were listed as managers on the 2025 Annual Report. Key filed its Chapter 7 petition just two days later, on January 15, 2026. A copy of the January 13, 2026 Articles of Amendment is attached as Exhibit "S."

56.

Key's bankruptcy schedules listed a "Potential Legal Malpractice claim against Josh McCrory" (Schedule B, Item 74, value "Unknown"). McCrory served as settlement agent on the Citizens Bank loan closing (Exhibit "O"). See Exhibit "T."

57.

Sims's conduct constitutes actual fraud. Sims caused Key to be used for the purpose of perpetrating and did perpetrate an actual fraud on North Point.

58.

Sims's actions were dishonest with intent to hinder, delay, and defraud North Point.

59.

As a member and manager of Key, Sims cannot escape liability where he had direct, personal participation in the wrongdoing, as to be the guiding spirit behind the wrongful conduct and the control figure in all challenged Key activity. Sims is individually liable for fraudulent or tortious acts committed while in the service of Key.

60.

Apart from his status as Key's sole member and manager, Sims is personally liable under Mississippi law for his direct participation in conversion of North Point's proceeds and inventory, and fraudulent misrepresentation. North Point seeks judgment against Sims for his own tortious conduct, not merely by reason of his status as an LLC member or manager.

61.

Sims personally directed the diversion of Gross Sales from the controlled Regions Bank Account ending in 1717 to Key's other Regions Bank account ending in 6565 beginning in approximately November 2022; personally made the September 7, 2023 statement to the Arbitrator that no funds had been misspent; personally signed the unlimited guarantee on the Citizens Bank loan; personally approved every transfer and payment described in paragraphs 38 through 42 and 48 through 55; personally caused $550,000 to be applied on July 21, 2025 to reduce his own exposure under his unlimited personal guarantee to Citizens Bank; and, upon information and belief, personally caused the $500,000 proceeds from the Pharmaco drug rights transfer to be applied to further pay down the same personally guaranteed loan in approximately December 2025.

62.

Sims was the primary decision-maker and controlled all financial activity on Key's bank accounts. Although Melinda Dove, a Key contractor, and Ronnie Grogan, co-owner of Copay Consultants, were also signatories on Key's Citizens Bank account, no funds were transferred, wired, or disbursed from Key's accounts without Sims' personal authorization and direction. Key had no independent board of directors, no advisory board, and no officers with independent authority to approve financial transactions.

63.

Sims used Key as his instrumentality. Sims commingled personal and business finances by paying personal residential utility bills, personal insurance premiums (approximately $793/month to Freedom Life Insurance), and personal expenses directly from Key's bank accounts. Sims treated Key's revenue - including North Point's misappropriated proceeds - as his personal funds, paying himself $15,000 per month in salary, taking a $185,000 "Owner Distribution" in November 2024, and using $550,000 of Key's funds on July 21, 2025 to reduce his own personal guarantee exposure to Citizens Bank. Key was undercapitalized from inception of the Citizens Bank loan: its only substantial assets were North Point's misappropriated proceeds and pharmaceutical assets acquired with those proceeds. Key observed no separation of Sims' personal financial interests from Key's operations - Sims was the sole member, sole manager, sole decision-maker, and sole beneficiary of Key's financial activity. Sims used Key as a mere instrumentality for personal purposes which renders him individually liable.

64.

Sims personally committed fraud. Key's fraud resulted in a loss of money and property to North Point.

65.

Sims knowingly breached the Commercialization Agreement and ignored the Arbitrator's sequestration orders, the Modified Final Order, and the federal court's May 19, 2025 judgment. Sims intended or was substantially certain that his actions - including diverting Gross Sales, blocking North Point's account access, using $550,000 to pay down his personally guaranteed bank loan, and, upon information and belief, using approximately $500,000 from the Pharmaco drug rights transfer to further pay down the same loan - would cause injury to North Point. Looking at the totality of circumstances, it is clear Sims intended to deceive and had a reckless disregard for the truth and/or an outright falsity combined with the sheer magnitude of the misrepresentations.

66.

Sims did fraudulently and wrongfully take away money and property of North Point with the intent to convert the funds to Sims' and Key's use and with intent to permanently deprive North Point of the funds and property.

67.

Sims intended to cause - and in fact did cause - injury and harm to North Point. Sims had a subjective motive to cause harm to North Point or at the very least, there was an objective substantial certainty that harm and loss would result to North Point.

68.

At all times Key was under the instruction, supervision, and direction of Sims. Key and its funds were controlled by Sims. The specific actions of Sims have caused significant damages to North Point in the amount of at least $5,649,641.86 (the "Indebtedness"). An itemization is attached as Exhibit "D." Each component of the Indebtedness is traceable to Sims' personal tortious conduct: (a) Net Sales Proceeds of $1,844,953.21 (North Point's 80% share of Gross Sales, less the single payment of $26,729.09 received from Key on December 19, 2023), which Sims personally converted through the diversion scheme described above, appropriating North Point's proceeds for personal salary, owner distributions, insider payments, acquisition funding, and reduction of his personal guarantee exposure; (b) the $500,000 cash deposit ordered by the Arbitrator and confirmed by the federal court's May 19, 2025 judgment, which Sims personally refused to pay and instead used for Key's operations and his own benefit; (c) Inventory Loss of $1,735,804.44, caused by Sims' personal refusal to transfer North Point's inventory to its new commercialization partner, resulting in the expiration of 843 units of North Point's

pharmaceutical inventory; (d) Legal and Arbitration Costs of $601,635.90, incurred by North Point as a direct and proximate result of Sims' personal tortious conduct; and (e) Contractual Interest of $967,248.31, accruing on the foregoing amounts under the Agreement's late-payment provision as a consequence of Sims' ongoing refusal to return North Point's proceeds and property. The full amount of the Indebtedness - including attorneys' fees, legal costs, and contractual interest - is recoverable as non-dischargeable debt under §523(a).

69.

Sims is liable for his personal conduct as described in paragraphs 7 through 56 above. His direct participation in the diversion, concealment, and misappropriation of North Point's proceeds and property supports a determination of non-dischargeability under each count below.

## COUNT ONE – 11 U.S.C. §523(a)(2)(A) and (B)

70.

North Point reasserts and re-alleges Paragraphs 1 through 69 above which are incorporated herein by reference.

71.

The Indebtedness owed to North Point is excepted from discharge pursuant to 11 U.S.C. §523(a)(2)(A) and §523(a)(2)(B).

72.

Sims obtained money and property from North Point by false pretense, false representation, and/or actual fraud.

73.

North Point asserts Count One primarily under the "actual fraud" prong of 11 U.S.C. §523(a)(2)(A). Beginning no later than November 2022, Sims caused Gross Sales belonging to North Point to be diverted from the controlled Regions Bank Account ending in 1717 to Key's other Regions Bank account ending in 6565, concealed that diversion from North Point, blocked North Point's access to the Bank Account, and used those proceeds for unauthorized purposes including payments to insider entities, personal expenses, the Legacy-Xspire acquisition, and the July 21, 2025 paydown of Sims' personally guaranteed Citizens Bank debt. These acts constitute a scheme of actual fraud through which Sims obtained and retained money and property belonging to North Point. Sims' September 28, 2023 email to McCrory (Exhibit "E") is a contemporaneous written record of the scheme: Sims stated his plan to use the "soft proceeds" - North Point's restricted sales proceeds - to create a false showing of financial strength, obtain bank financing, and "buy our own assets moving forward." Sims then executed that plan. Through this scheme, Sims personally obtained North Point's property by exercising dominion and control over the restricted proceeds and converting them to his personal benefit - including

$15,000 per month in salary, a $185,000 owner distribution, the $315,000 Tampa condominium purchase, personal insurance premiums and utility payments, and $550,000 applied to reduce his own personal guarantee exposure to Citizens Bank.

74.

In addition, on September 7, 2023, during the ICC arbitration proceeding, Sims represented to North Point and the Arbitrator that no funds had been misspent and that Key merely needed additional time to finalize the accounting. That statement was false because, by that date, Sims had already caused Gross Sales to be diverted from the controlled Bank Account and spent without North Point's approval. In reliance on that statement, North Point refrained from seeking emergency relief in state or federal court to freeze Key's accounts, allowed the arbitration to proceed on a standard briefing schedule, and continued to forbear from enforcing its contractual remedies. During that period of forbearance, Sims caused the transfers and payments described in paragraphs 29, 38 through 42, and 48 through 49, including the $250,000 Legacy-Xspire deposit, the transfer of remaining proceeds to Citizens Bank, ongoing insider payments, and the $550,000 loan paydown on July 21, 2025. That reliance was justifiable because, although North Point had visibility into Regions account ending 1717 on September 7, 2023, North Point had no knowledge of or access to Regions account ending 6565, into which Sims had been diverting proceeds since approximately November 2022. The falsity of Sims' statement that no funds had been misspent was not apparent from the information available to North Point because the diversion to the hidden account was itself concealed. North Point's remaining visibility into Regions account ending 1717 was subsequently removed on September 23, 2023. Sims' September 7, 2023 statement was a specific factual and false representation about the status of North Point's restricted proceeds in the controlled Bank Account.

75.

Sims' actions of each of the earlier referenced transfers and misappropriation of funds created debt to North Point derived by fraud. Sims had direct and personal participation in the misappropriation of funds and was the central figure in the wrongful conduct.

76.

Sims' indebtedness to North Point was created and obtained by fraud involving moral turpitude and/or intentional wrong. Sims completed his actions by false pretenses, a false representation and/or actual fraud.

77.

Sims' representations and/or pretenses were knowing and fraudulent falsehoods which were describing past and/or current facts. North Point relied upon Sims to its detriment and suffered injury as a result. Sims' misleading conduct intended to create and foster a false

impression. Sims' actions and conduct consists of deceit, artifice, trick, and/or design involving direct and operation of the mind which was used to circumvent and cheat North Point with the design of perpetrating the deception.

78.

Based upon the totality of the circumstances, Sims had no intention of preforming any of the obligations owed to North Point. North Point relied upon Sims to complete his obligations in good faith and in an honest manner. Sims fraudulently induced North Point to continue to participate in the Agreement.

79.

Specific money belonging to North Point was obtained by fraud and the resulting debt arising from Sims' wrongful actions is excepted from discharge.

80.

In the alternative, and to the extent any representation described above is deemed a statement respecting the debtor's or an insider's financial condition, North Point asserts that the Indebtedness is excepted from discharge under 11 U.S.C. §523(a)(2)(B). Sims provided Citizens Bank with written financial statements - including Key's 2023 company-prepared compilation, Key's 2024 year-end financials, Sims' personal financial statements dated January 19, 2024 and March 17, 2025, and Sims' 2023 personal tax return - that were materially false in writing with respect to Key's and Sims' financial condition, as detailed in paragraphs 35, 43, 45, and 46 above. Sims published those written statements with the intent to deceive Citizens Bank into extending and renewing the $2,500,000 line of credit. Citizens Bank reasonably relied on those written statements in originating and renewing the loan, the proceeds of which Sims used to acquire the Legacy-Xspire assets and to operate Key's business - all while converting North Point's restricted proceeds. The written financial statements were materially false as set forth above, and Sims knew they were false at the time he provided them.

81.

Sims provided a statement to North Point that had a direct relation to and/or impact on the overall financial status. The debt owed to North Point is non-dischargeable pursuant to §523(a)(2)(B).

## COUNT TWO – 11 U.S.C. §523(a)(4)

82.

North Point reasserts and re-alleges Paragraphs 1 through 81 above which are incorporated herein by reference.

83.

The Indebtedness owed to North Point is excepted from discharge pursuant to 11 U.S.C. §523(a)(4).

84.

The Commercialization Agreement required Key to: (a) maintain a segregated Bank Account dedicated exclusively to Gross Sales from North Point's Pharmaceutical Products; (b) grant North Point a first-priority perfected security interest in the Bank Account through a tri-party deposit account control agreement; (c) obtain North Point's written approval before making any disbursements from the Bank Account; (d) use funds in the Bank Account only for approved Commercialization Expenses; (e) provide North Point with full visibility into all transactions in the Bank Account; and (f) deposit all Gross Sales into the Bank Account. These provisions created an express trust relationship with an identifiable res (Gross Sales proceeds in the dedicated Bank Account), defined fiduciary duties (segregation, deposit, approval-only disbursement, and reporting obligations), and a designated beneficiary (North Point, which retained beneficial ownership of all proceeds until the monthly profit distribution was calculated under Schedule A). The trust obligations arose from the Agreement itself and existed independently of and prior to Sims' wrongdoing. Sims breached every one of these restrictions by removing all revenue from the Bank Account without North Point's approval, transferring proceeds to a hidden account, blocking North Point's access, failing to account for or return the funds, and diverting North Point's funds to personal use, insider entities, and unauthorized transactions. North Point entrusted its property and money to Sims. Then Sims misappropriated the property and money for other uses than for which it was entrusted. Clearly Sims intended to defraud North Point.

85.

Sims committed embezzlement and/or larceny of the money and property of North Point within the meaning of 11 U.S.C. §523(a)(4). Under the Commercialization Agreement, Key lawfully received Gross Sales proceeds from the sale of North Point's Pharmaceutical Products for the limited purpose of deposit into a dedicated Regions Bank account ending 1717 and payment of Commercialization Expenses approved by North Point. Beginning in approximately November 2022, Sims caused those proceeds to be transferred from the dedicated Regions account ending 1717 to a separate Key-controlled Regions Bank account ending 6565 that was hidden from North Point. On September 23, 2023, Sims caused North Point's remaining visibility into Regions account ending 1717 to be removed. From Regions account 1717 and 6565, Sims appropriated North Point's proceeds for unauthorized purposes including personal salary and owner distributions. In late December 2023, Sims used approximately $250,000 of North Point's misappropriated proceeds as the deposit for Key's $4,000,000 acquisition of pharmaceutical assets from Legacy-Xspire Holdings, LLC. In approximately April 2024, Sims

transferred the remaining North Point proceeds from Regions account 1717 and 6565 to Key's newly opened Citizens Bank account ending 2026, which had a beginning balance of $60.00 on April 1, 2024 before receiving over $940,000 in deposits that month. Sims falsely represented to Citizens Bank that Key had good and marketable title to those funds and used North Point's misappropriated proceeds as operating capital for Key's post-acquisition business. From the Citizens Bank account, Sims caused payments to insider entities Gentex Pharma, LLC and Copay Consultants, LLC, personal expenses, personal distributions to Robert Sims and on July 21, 2025 caused $550,000 to be applied to pay down Key's $2.5 million Citizens Bank loan—directly reducing Sims' own exposure under his unlimited personal guarantee.

86.

Sims abused his fiduciary position through his active misconduct and deprived North Point of its property and money. Sims' acquisition and use of North Point's property and money created the debt owed to North Point.

87.

Sims was the member, manager and controlling individual of Key. Thus, Sims' relationship to Key and obligations to North Point involved trust-type obligations imposed by law. As the managing member of Key, Sims is liable for his own misconduct. Sims is charged with carrying out the fiduciary duty on behalf of Key.

88.

Further, Sims intended and knew that his knowledge of and/or gross recklessness as to his improper conduct towards North Point was a breach of his relevant fiduciary duties. Sims consciously disregarded and/or willfully was blind to the substantial and unjustified risk that his conduct would violate his fiduciary duty. Sims' conduct was a gross deviation from the standard of conduct that a law-abiding person would observe.

89.

Sims' actions and conduct constitutes fraud and/or defalcation while acting in a fiduciary capacity. The indebtedness owed to North Point is excepted from discharge.

## COUNT THREE – 11 U.S.C. §523(a)(6)

90.

North Point reasserts and re-alleges Paragraphs 1 through 89 above which are incorporated herein by reference.

91.

The Indebtedness owed to North Point is excepted from discharge pursuant to 11 U.S.C.

§523(a)(6).

92.

Sims caused willful and malicious injury to North Point and/or to the property of North Point.

93.

Sims' actions as set forth above were deliberate and intentional, not merely reckless or negligent. Sims acted with the intent to cause injury to North Point and its property, or alternatively, with knowledge that his actions were substantially certain to cause such injury. Specifically, Sims refused to return North Point's pharmaceutical inventory after Key terminated the Agreement, causing 843 units to expire; continued selling North Point's products under Key's label while concealing the proceeds; blocked North Point's access to the Bank Account to prevent North Point from discovering the diversion; refused to comply with the Arbitrator's sequestration orders and the federal court's May 19, 2025 judgment requiring Key to return North Point's money; and eighteen days after North Point sought appointment of a receiver, used $550,000 of North Point's proceeds to pay down his own personally guaranteed loan rather than allow a receiver to recover those funds. Sims' September 28, 2023 email to McCrory (Exhibit "E") demonstrates that Sims knowingly planned to use North Point's restricted proceeds for his own benefit rather than comply with the sequestration order, and then carried out that plan over the following two years. Sims' conduct was without just cause or excuse.

94.

Sims' misconduct resulted in a deliberate and/or intentional injury to North Point. There was a substantial certainty that North Point would be harmed as a result of Sims' actions. Further, under the circumstances, Sims held a motive to cause harm to North Point.

95.

Sims had knowledge of North Point's rights to its property and money and Sims knew that his misconduct and actions would cause a particularized injury to North Point. There is no evidence that Sims made any effort to ensure that North Point received its property or money. To the contrary, Sims immediately began his misuse and misappropriation of North Point's property and money.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff, North Point Rx, LLC requests the Court to find that its Complaint is well taken and should be granted. North Point Rx, LLC requests that judgment be entered in its favor and against the Defendant, Robert Wayne Sims as follows:

A)    Judgment in the amount of $5,649,641.86 as non-dischargeable pursuant to 11

U.S.C. §523(a)(2)(A) and/or §523(a)(2)(B) under Count One;

B)      Judgment in the amount of $5,649,641.86 as non-dischargeable pursuant to 11 U.S.C. §523(a)(4) under Count Two;

C)      Judgment in the amount of $5,649,641.86 as non-dischargeable pursuant to 11 U.S.C. §523(a)(6) under Count Three;

D)      Plus attorney fees, costs and expenses in pursuit of this Judgment; and

E)      All and other general and equitable relief in which North Point Rx, LLC would be entitled and appropriate as determined by the Court.

Respectfully submitted,

**NORTH POINT RX, LLC**

By:      *s / Derek A. Henderson*
         **DEREK A. HENDERSON**
         ATTORNEY FOR NORTH POINT RX, LLC

**Derek A. Henderson, MSB #2260**
**Anna Claire Henderson, MS Bar #106230**
**1765-A Lelia Drive, Suite 103**
**Jackson, Mississippi 39216**
**Telephone: (601) 948-3167**
**Facsimile: (601) 948-0109**
**derek@derekhendersonlaw.com**
**annaclaire@derekhendersonlaw.com**